Donald R. GOODSON, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–76–787.

Court of Criminal Appeals of Oklahoma.

April 1, 1977.

**898**

Paul E. Garrison, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Douglas L. Combs, Asst. Atty. Gen., for appellee.

## OPINION

BRETT, Judge:

Appellant, Donald R. Goodson, hereinafter referred to as defendant, was charged in the District Court, Tulsa County, Case No. CRF–74–2760, with the offense of Knowingly Concealing Stolen Goods, in violation of 21 O.S.1971, § 1713. The case was tried to a jury and a guilty verdict was returned. Punishment was assessed at two (2) years' imprisonment. From said judgment and sentence a timely appeal has been perfected to this Court.

Defendant was tried conjointly with codefendant Jerry Austin Estep, whose appeal we have considered separately (F–76–666).

Ferrell Kirtley, a salesman at Sears and Roebuck in Tulsa, testified that he was charged with embezzlement along with Wayne Padgett and Pete Nicklau. He further testified that in November, 1974, he had entered into a scheme with Padgett and Nicklau to steal merchandise, large appliances such as refrigerators, washers and dryers, televisions and dishwashers, from Sears. On certain Wednesdays he, along with Padgett and Nicklau, would remove merchandise from the Sears warehouse and load them onto Padgett's truck. He would then go to a restaurant in Tulsa and receive payment for the articles. On November 20, 1974, he loaded a washer and dryer onto a blue pickup truck owned by Padgett. He stated that the washer and dryer had not been lawfully sold. Later that afternoon, he said, Padgett returned to Sears to take a color television and a refrigerator. In court the witness identified a white washer and dryer as items he had given to Padgett on November 20.

Ronald Marsh, a Sears security guard, stated that on November 19, 1974, he made an inventory of the articles under Kirtley's control by recording the model and serial numbers of the major appliances in the store at that time. On November 20 he concealed himself in a camper pickup truck in the Sears parking lot. During the day he observed Kirtley transfer possession of several appliances to Padgett and Nicklau. Among these items were a white washer and dryer, a television and a refrigerator. On the evening of November 20, a second inventory was performed by the witness, and by this method Marsh verified that several items had been removed without sales tickets being written. Marsh identified State's Exhibits Nos. 1 and 2 as the washer and dryer which had been removed on November 20, and for which no sales ticket had been issued.

Caroll Gatlin, working at Sears as an off-duty police officer, stated that he assisted Marsh in making the inventory described above, and while Marsh was engaged in the

surveillance mentioned above he went to the Sundowner Apartment complex in Tulsa with Officer Jim Aud, there arresting Padgett and Nicklau for the offense of possession of stolen property.

Officer David Harrison said that he and other officers were assigned to go to Padgett's residence in Tulsa during the evening of November 20, 1974. At the time of his arrival there was a red pickup parked in the driveway. A female emerged from the house, turned the truck around and backed it partway into the open garage. A few minutes later he observed two females in the garage attempting to load a large light colored metallic sounding object onto the pickup. A few moments later he saw a car pull up to the residence, two males emerged, went to the garage, and loaded another large light colored metallic sounding object onto the pickup. The two males then started to drive away but the officers blocked the driveway and arrested the occupants in the pickup. Harrison then identified co-defendant Estep and the defendant as the two individuals arrested that night. He further identified State's Exhibits Nos. 1 and 2 as a washer and dryer which were in that pickup.

Jim Aud was the State's next witness and he stated that on November 20, 1974, he was a Tulsa Police Officer. He helped effectuate the arrests of Padgett and Nicklau earlier that day, and later that evening he observed co-defendant Estep at the police station. There, they had a conversation. At this point the jury was excused in order to have an appropriate in camera hearing to determine the admissibility of statements made by Estep. At this hearing co-defendant Estep testified, as did Assistant District Attorney Thompson. Following this hearing co-defendant Estep's motion to suppress his statements was overruled. Defendant renewed his motion for a severance as he was not present when co-defendant Estep made the statements. Said motion was also denied. The jury was then brought back in and admonished to not consider the statements made by co-defendant Estep against the defendant. Continuing with his testimony, Officer Aud related the substance of the conversation with co-defendant Estep. With the conclusion of this witness' testimony, the State rested.

The first witness called on behalf of the defense was Louise Padgett. She testified that she was the wife of Wayne Padgett and related that on November 20, 1974, she sewed from approximately 10:00 a.m. until 3:00 p.m., and that she was interrupted about midday when she observed Pete Nicklau unload a washing machine and dryer and television set in her garage. The witness stated that she had seen Mr. Nicklau on several previous occasions. She further stated that she had gone to the home of her sister at approximately 3:15 p.m. and returned home at approximately 8:30 that evening. Mrs. Padgett stated that upon returning home she received a telephone call from an attorney by the name of Dunn, and after she received this call she telephoned her sister and asked her to come over. The witness stated that when her sister arrived at her home she went outside and got into the pickup, turned it around, and backed it into the open garage. The witness stated that she and her sister then proceeded to load one of the appliances onto the bed of the pickup. At this time the defendant and co-defendant Estep rang the doorbell and the witness asked them both to come around to the garage. The witness stated the defendant and co-defendant loaded the washer onto the pickup. The witness stated she told them that her husband and Pete Nicklau had been arrested and that Nicklau had brought the appliances to her garage but she did not want them there; and, therefore, she was taking them back to Nicklau.

The witness also stated that she had also asked co-defendant Estep to move the pickup forward so that she could close the door, and further related that as they got to the pickup and pulled forward the police arrived. The witness then related the events she observed surrounding the arrest of the defendant and co-defendant Estep.

The next witness called on behalf of the defendant was Geneva Pearsoll. She relat-

ed that she was the sister of Mrs. Padgett, ant her testimony to a substantial degree corroborated that of Mrs. Padgett.

Patricia Rothermel was called as the next defense witness and related that she managed the 5000 East Mobile Home Community where defendant resided. The witness related that she was familiar with Tulsa Police Officer Jim Aud, and stated that she had a conversation with Officer Aud in her office relating to the defendant. The witness stated that Officer Aud told her the defendant was just in the wrong place at the wrong time.

Defendant then took the stand in his own behalf and testified that on November 20, 1974, he had gone out to celebrate his birthday in a club, and had been approached by Estep. As a result of that conversation they went to the Padgett home. The defendant's testimony was practically identical to testimony related earlier by Mrs. Padgett and Ms. Pearsoll. The defendant denied any knowledge of the stolen nature of the goods, as well as any prearranged plan to meet co-defendant Estep on the date in question. Following the testimony of defendant, the defense rested.

The State then called three rebuttal witnesses whose additional testimony did not add significantly to the State's case.

In his first assignment of error defendant contends that the trial court erred in not granting a severance as requested by him prior to trial. Defendant asserts that the court was made aware prior to trial that the State would seek to introduce at trial several inculpatory statements made by co-defendant Estep out of the presence of defendant, which statements inculpated defendant as well. As noted in the statement of facts, defendant's motion for a severance was renewed, and denied, immediately prior to the statement's admission. Defendant contends that his co-defendant's extrajudicial inculpatory statements were hearsay as to him, that he was denied the rights to cross-examine his co-defendant, and thus under the rule in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476

(1968), a severance should have been granted. We agree.

The critical issue in this case, as we see it, is the knowledge and intent of the defendant at the time he received the property in question. Knowledge and intent, being subjective states of mind, are most often proved by circumstantial evidence, barring a direct admission of the same. As to defendant, apart from co-defendant Estep's inculpatory statements, the circumstantial evidence tending to show his knowledge that the goods were stolen and his intent to conceal them was very slim indeed. It was not shown at trial that he was part of the embezzlement scheme of Kirtley, Padgett and Nicklau. Defendant's involvement did not begin until he arrived at the Padgett residence on November 20 at about 9:00 p.m., as testified to by the officers who were keeping the residence under surveillance. Upon arrival, defendant and co-defendant Estep proceeded to the garage and helped the two women load the truck. They then got into the truck and moved it forward, at which time they were apprehended. The State introduced no evidence showing that defendant knew that Padgett had been arrested, nor any evidence tending directly to show that defendant knew the goods to be stolen.

Co-defendant Estep's statements, when viewed in this context, were thus very damaging to the defendant, and the requested severance should have been granted. Estep's statements as related by Officer Aud from the witness stand are reflected in the transcript as follows:

"A. Mr. Estep stated that instead of asking him questions he would rather tell it in his own words basically what had transpired the day before when he was arrested. Mr. Estep stated that he observed Wayne Padgett in a police car being transported toward the police station and at this time he felt like that he should try to find out why he was being taken to jail because they were friends and it was a friend of his. Estep stated that he tried several times to call Padgett's house apparently to contact his

wife or whoever might be there. He said that he was unable to do this. He said then that he went to Mr. Don Goodson's house and got Don Goodson to drive him in Goodson's car over to Wayne Padgett's residence.

"Q. Did he say what happened when he got there?

"A. Yes. After they arrived at Wayne Padgett's house they approached the front door and I don't remember if they knocked or just didn't go in the front door but they then went around the house to where the overhead garage door is and went in the garage area.

"Q. Did he say what occurred then?

"A. Mr. Estep said that when him and Goodson got into the garage area there was a pickup backed into the garage, about half way into the garage, and that there were two women inside the garage and there was a white appliance in the bed of the pickup and there was another white appliance sitting on the floor of the garage when they first got there.

"Q. Did he say anything else?

"A. Mr. Estep said that of the two women there he only knew one of the women and recognized that as being Wayne Padgett's wife and didn't recognize the other one. He said also that upon seeing these items in the garage and him being a close friend of Wayne Padgett that *they* had to get the items out of the garage since Wayne Padgett had gone to jail and something had to be done with the items—*they* had to take them out of his house for him." (Tr. 213–214) (Emphasis added)

Similarly, the witness stated:

"Q. Now, Officer, did you have any conversation with Jerry Estep concerning where the property was going to be taken?

"A. Yes.

"Q. Tell us what he said in that regard.

"A. He stated that—he didn't state where it was going to be taken.

"Q. Did he say what they were going to do with it?

"A. They wanted to get rid of it.

"Q. Did he say why?

"A. He felt like the stuff had to be taken out of there, that since Wayne Padgett had been arrested that he had to get rid of the stuff for him." (Tr. 215–216)

While not a direct admission of his own knowledge and intent, these statements made by co-defendant Estep were of such a nature that said knowledge and intent . could reasonably be inferred therefrom. Further, both the District Attorney and co-defendant Estep's attorney made it quite clear that "they" referred to the defendant as well as to co-defendant Estep.

We are thus of the opinion that the introduction of co-defendant Estep's statements seriously prejudiced the defendant, in spite of the admonition given by the court to the jury, to disregard the statements as to the defendant. *Fugett v. State*, Okl.Cr., 461 P.2d 1002 (1969). Further, due to the paucity of the State's evidence showing knowledge and intent on the part of the defendant, the admission of these statements as to defendant is not subject to the harmless error doctrine of *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

Because of our disposition of defendant's first assignment of error, we deem it unnecessary to discuss the other purported errors raised by defendant.

For the foregoing reasons the judgment and sentence is REVERSED and REMANDED for a new trial.

BUSSEY, P. J., and BLISS, J., concur.